# United States Court of Appeals
## For the First Circuit

No. 16-1008

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL P. O'DONNELL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella and Barron, Circuit Judges,
and Lisi,* District Judge.

James L. Sultan, with whom Charles W. Rankin and Rankin &
Sultan were on brief, for appellant.
Mark J. Balthazard, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

October 19, 2016

---

* Of the District of Rhode Island, sitting by designation.

**BARRON**, **Circuit Judge**.  Michael O'Donnell appeals from his conviction on one count under 18 U.S.C. § 1344, the Bank Fraud Act.  We affirm.

## I.

O'Donnell was indicted under the Bank Fraud Act (the Act) on June 15, 2015.  The Act provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

The indictment alleged that O'Donnell violated subsections (1) and (2) of the Act.  Specifically, the indictment alleged that he "knowingly executed and attempted to execute a scheme and artifice to defraud Countrywide Bank, FSB, a federally-insured financial institution, and to obtain money . . . and other property owned by and under the custody and control of Countrywide Bank, FSB, by means of false and fraudulent pretenses, representations, and promises, concerning material facts and matters in conjunction with a mortgage loan in the amount of

$44,000 for property located at 40 Harbor Street, Salem, Massachusetts."

Following indictment, O'Donnell waived his right to a jury trial and opted for a bench trial. He also entered into a stipulation. The stipulation set forth the following facts concerning the scheme alleged in the indictment.

While serving as a self-employed loan originator operating through his loan originator business, AMEX Home Mortgage Corporation, O'Donnell completed loan applications and submitted them to mortgage companies on behalf of individuals seeking to purchase or refinance property. In 2007, O'Donnell sought to defraud mortgage lenders in connection with the refinancing of the property in Salem, Massachusetts referenced in the indictment.

The scheme began with O'Donnell's efforts to obtain a mortgage loan on a different property, which was owned by a woman named L.T. In connection with that transaction, O'Donnell submitted a mortgage loan application containing false information about L.T. to Homecomings Financial Network, Inc. O'Donnell also paid, from a bank account controlled by AMEX, approximately $37,000 that L.T. was supposed to put down herself to secure the loan for that property.

After O'Donnell was successful in securing the mortgage loan in L.T.'s name, O'Donnell then sought to secure a second mortgage loan in L.T.'s name, this time for the Salem,

Massachusetts property named in the indictment.  O'Donnell sought this loan in order to obtain the $37,000 that he had put down to secure the first loan in L.T.'s name.

O'Donnell submitted the application for this second loan to a different entity from the one to which he had submitted the application for the first loan.  The stipulation referred to the entity to which O'Donnell submitted the second loan application as follows: "Countrywide, where Countrywide Home Loans employees underwrote and processed the application."

This second loan application contained many of the same false statements that were in O'Donnell's application for the first loan in L.T.'s name.  O'Donnell also provided fraudulent responses to various follow-up inquiries in the course of seeking this second loan.  When this second loan closed, O'Donnell pocketed most of the proceeds.

The key issue at trial concerned whether O'Donnell's fraudulent scheme to secure the second loan targeted Countrywide Bank, FSB, as the indictment alleged, or only Countrywide Home Loans, as O'Donnell contended.  The identification of the intended target was crucial because O'Donnell stipulated that Countrywide Bank, FSB was a "financial institution" within the meaning of the Act, while the government did not dispute that Countrywide Home Loans was not.

In ruling from the bench at the close of evidence, the District Court explained that it had determined that the record showed that O'Donnell was "on notice" that Countrywide Bank, FSB was "part of this transaction in some form" in the second loan transaction. With that finding in place, the District Court then found that O'Donnell was guilty of "attempt[ing]" to execute -- though not of actually executing -- a scheme or artifice described in subsections (1) and (2) both because O'Donnell had intended to defraud Countrywide Bank, FSB and because he had intended to obtain money and property that was under Countrywide Bank, FSB's custody and control. This appeal followed.

## II.

"We review a bench trial conviction de novo, examining the facts and inferences in the light most favorable to the verdict." United States v. Ngige, 780 F.3d 497, 503 (1st Cir. 2015) (citing United States v. Tum, 707 F.3d 68, 69 (1st Cir. 2013)). The ultimate question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Grace, 367 F.3d 29, 33 (1st Cir. 2004) (quoting United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004)). "[T]his court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible

rendition of the record." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).

We start with the Supreme Court's most recent case construing the Act, Loughrin v. United States, 134 S. Ct. 2384 (2014). Loughrin makes clear that subsections (1) and (2) of the Act set out two routes to proving criminal liability under the statute. See id. at 2389-92. Loughrin also makes clear that proof that the defendant violated either subsection is sufficient to support a conviction under the Act. Id. Because we conclude that the evidence in this case was sufficient to prove a violation under subsection (1), we confine our analysis to what the evidence shows regarding that portion of the Act.[1] See United States v. Gaw, 817 F.3d 1, 4 (1st Cir. 2016) ("[W]e must affirm each count if the evidence is sufficient for the jury to have convicted [the defendant] under any one of the relevant theories of liability presented to the jury as to that count.").

Under subsection (1), a defendant who "knowingly executes or attempts to execute" a scheme or artifice to defraud a "financial institution" violates the Act.[2] O'Donnell contends

---

[1] Our prior cases did not always distinguish between the two subsections of the statute in the way that Loughrin now requires.

[2] In contrast to subsection (1), under subsection (2), Loughrin makes clear, the government must show that "the defendant intend[ed] 'to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution.'" Loughrin, 134 S.Ct. at 2389 (quoting 18 U.S.C. § 1344(2)). Thus, under subsection (2), a defendant may be

- 6 -

that because the District Court found him guilty under subsection (1) only of "attempt[ing]" to defraud a financial institution (rather than of actually "knowingly execut[ing]" such a scheme), the government was required to show that O'Donnell specifically intended to defraud Countrywide Bank, FSB and that he took a substantial step towards doing so.  The government does not appear to disagree.  The government instead simply contends that the evidence sufficed to show that O'Donnell did specifically intend just that.

O'Donnell's contrary argument proceeds in the following steps. He first argues that, under the "attempt" prong of subsection (1), the government had to prove that he specifically intended to defraud a "financial institution."  He thus contends that the government had to prove that he specifically intended to defraud Countrywide Bank, FSB, and not simply Countrywide Home Loans.  After all, the parties agree that only Countrywide Bank, FSB is a "financial institution" under the Act.  For that reason,

convicted for violating the Act if he used fraudulent means to attempt to obtain money or property that he knew was "owned by, or under the custody or control of, a financial institution." Loughrin, 134 S. Ct. at 2388 (citing 18 U.S.C. § 1344(2)).  And, a conviction on that basis is proper even if the defendant made no "false or fraudulent pretenses, representations, or promises" directly to the financial institution. Id.  Still, under that subsection, the government must show that the "moneys . . . or other property" sought by the defendant were "owned by, or under the custody or control of, a financial institution," which, in this case, would be Countrywide Bank, FSB and not Countrywide Home Loans. Id.

- 7 -

an attempt to defraud Countrywide Home Loans would not be an attempt to defraud a "financial institution" and thus would not be a crime under subsection (1).

O'Donnell then contends that the evidence shows that, at most, Countrywide Bank, FSB "may have been involved in some way in the transaction." As a result, O'Donnell contends, he cannot have been found guilty under subsection (1), because the evidence in the record that supports a finding that O'Donnell knew that Countrywide Bank, FSB was involved "in some way" is insufficient to show that he specifically intended to defraud Countrywide Bank, FSB.[3]

To support this argument about the insufficiency of the evidence, O'Donnell contends that the record reveals what he characterizes as only a "perfunctory reference" to Countrywide

---

[3] We note that the government expressly argued to the District Court that a showing that there was a "risk of loss" to the financial institution was required under subsection (1), and it appears that the District Court made its finding of guilt under subsection (1) on the understanding that a "risk of loss" showing was required. O'Donnell does not challenge on appeal, however, the "risk of loss" finding that the District Court made. We thus treat as waived any argument by O'Donnell regarding the "risk of loss" issue. The first time he directly addresses the risk of loss issue is in his reply brief, where he merely notes that the Supreme Court may "illuminate the scienter requirement" for subsection (1) in Shaw v. United States, 781 F.3d 1130 (9th Cir. 2015), cert. granted, 136 S. Ct. 1711 (2016). In Shaw, the Ninth Circuit, post-Loughrin, held that a conviction under subsection (1) does not require the government to prove a risk of loss to the financial institution. Id. at 1136. Other circuits however, pre-Loughrin, have reached the opposite conclusion. See, e.g., United States v. Staples, 435 F.3d 860, 866 (8th Cir. 2006).

Bank, FSB in the papers that he received in connection with his application for, and the approval of, the second loan transaction. He also notes that most of the loan documents that he saw referenced Countrywide Home Loans and not Countrywide Bank, FSB. Further, he points out that the documents that he did see and that referred to Countrywide Bank, FSB, also contained references to Countrywide Home Loans. Thus, he contends that, although the evidence shows that he may have specifically intended to defraud Countrywide Home Loans, the evidence that he knew of Countrywide Bank, FSB's involvement in the transaction is simply too slight to show that he specifically intended to defraud Countrywide Bank, FSB.

The first of the documents that O'Donnell received that referred to Countrywide Bank, FSB, however, was not just any document. It was the loan conditions sheet, which contained the loan's terms and the conditions for its approval. And that document did not just contain any reference to Countrywide Bank, FSB. It made the following statement: "Thank you for <u>submitting your loan to</u> Countrywide Bank, FSB.! We sincerely appreciate your business." (emphasis added).

O'Donnell does not deny receiving this document. In fact, the record shows that he responded to the document by supplying the specific and detailed information (fabricated though it was) that the conditions sheet sought.

In addition, O'Donnell received another document that referenced Countrywide Bank, FSB.  This second document was the final loan approval document.  This document informed O'Donnell that, by submitting the information requested by the conditions sheet, he had met the requirements that it had set forth.  And this second document made the same statement that the conditions sheet had made: "Thank you for submitting your loan to Countrywide Bank, FSB.! We sincerely appreciate your business."  Moreover, the record shows that, after receiving this second document, O'Donnell received a check made out to his business in consequence of the loan application's approval.

Given the documents that O'Donnell concededly saw in carrying out his fraudulent scheme, the nature of their references to Countrywide Bank, FSB, and what the record shows about what happened after he received each document, the record clearly supports a finding that O'Donnell was aware that Countrywide Bank, FSB -- and not just Countrywide Home Loans -- was involved in approving the loan that O'Donnell was seeking to obtain through fraudulent means.

Moreover, O'Donnell received these documents referencing Countrywide Bank, FSB while he was concededly engaged in a fraudulent scheme to secure a loan via false statements.  And he was, by his own account, a sophisticated actor in the loan origination business.  He thus fairly could have been understood

to have been aware, as we observed more than two decades ago, that "financial transactions are becoming increasingly integrated and complex" and that "the effects of fraudulent actions against one institution are increasingly likely to spill over and detrimentally affect others." Brandon, 17 F.3d at 427. As a result, the documents at issue sufficiently support the reasonable inference that, because O'Donnell was "on notice" of Countrywide Bank, FSB's involvement in the loan's approval, O'Donnell specifically intended to defraud Countrywide Bank, FSB and not simply Countrywide Home Loans. See United States v. Munyenyezi, 781 F.3d 532, 536 (1st Cir. 2015) (explaining that on sufficiency review we must "tak[e] the evidence and reasonable inferences in the light most helpful to the prosecution"); United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (explaining that "factfinders may draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings").[4]

To be sure, there is no evidence that O'Donnell was aware that Countrywide Bank, FSB was a "financial institution." But,

---

[4] O'Donnell's contention that the loan at issue in this case was not an "integrated transaction," as was true of the loan involved in United States v. Edelkind, 467 F.3d 791, 798 (1st Cir. 2006), is beside the point. Here, the evidence was sufficient to support a finding that O'Donnell had the specific intent to defraud Countrywide Bank, FSB even if the transaction was not of that "integrated" type, and nothing in Edelkind precludes such an assessment of this record.

there is no dispute that it is.  And we have long held that the defendant need not have scienter of that necessary fact in order to be found guilty under the Act.  See United States v. Brandon, 17 F.3d 409, 425 (1st Cir. 1994) ("The fact that it should turn out that the financial institution actually defrauded was federally insured is a fortuitous stroke of bad luck for the defendants but does not make it any less of a federal crime."). Nor does anything in Loughrin hold otherwise, as the Court had no occasion to address that question.  Thus, to the extent that O'Donnell means to contend that Loughrin requires us to depart from our precedent on this point, we see no basis for reaching such a conclusion.

O'Donnell next contends that, even if the record supports the inference that he specifically intended to defraud Countrywide Bank, FSB, the government still had to show that he took a "substantial step" towards executing that fraudulent scheme in order for him to be convicted of "attempt[ing]" to execute such a scheme.  But, as we have already pointed out, the record reveals that O'Donnell responded to the conditions sheet in which Countrywide Bank, FSB thanked him for submitting his loan by sending fraudulent information in order to secure the loan.  The sending of such information in response to that request qualifies as a "substantial step" because it is an act "of such a nature that a reasonable observer, viewing it in context, could conclude

- 12 -

beyond a reasonable doubt that it was undertaken with a design to violate the statute." See United States v. Dworken, 855 F.2d 12, 19-20 (1st Cir. 1988).

In so concluding, we recognize that the record shows that O'Donnell sent his response containing the fabricated information to Countrywide Home Loans -- rather than to Countrywide Bank, FSB. And we recognize, too, that the papers that O'Donnell received in connection with the loan transaction referred to both Countrywide Home Loans and to Countrywide Bank, FSB. But, as we have explained, the nature of the references in those documents to Countrywide Bank, FSB are such that the record adequately supports the inference that O'Donnell specifically intended to defraud that latter entity and not simply the former one. Thus, the record sufficiently supports the finding that, by submitting fraudulent information to secure the loan in response to the conditions sheet that thanked O'Donnell for submitting his loan to Countrywide Bank, FSB, O'Donnell was taking a substantial step in his attempt to execute a fraudulent scheme directed at that same entity, even though he sent the response itself to Countrywide Home Loans.

Finally, O'Donnell argues that it was legally impossible for him to commit attempted bank fraud if he did not commit the completed crime, given that he specifically intended to defraud only Countrywide Home Loans and that he was not found guilty of doing anything more than attempting to defraud Countrywide Bank,

FSB.  This contention necessarily rests, however, on the premise that the evidence showing O'Donnell's awareness of Countrywide Bank, FSB's involvement in the loan transaction is insufficient to support the finding that O'Donnell specifically intended to defraud Countrywide Bank, FSB.  But, as we have explained, that premise is mistaken, given the documents thanking O'Donnell for submitting his loan to Countrywide Bank, FSB and O'Donnell's admitted sophistication in the loan origination business. Thus, O'Donnell's legal impossibility argument is without substance.

## III.

For the foregoing reasons, the conviction is **affirmed**.