# United States Court of Appeals
## For the First Circuit

No. 16-1046

UNITED STATES OF AMERICA,

Appellee,

v.

JANICE TROISI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

James L. Sultan, with whom Kerry A. Haberlin and Rankin & Sultan were on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

February 24, 2017

**LYNCH**, **Circuit Judge**. After a bench trial, Janice Troisi was convicted in 2015 both of conspiracy to commit healthcare fraud, see 18 U.S.C. § 1349, and of healthcare fraud, see id. § 1347, for her role from January 2010 forward in an extensive scheme between 2006 and 2012 to defraud Medicare by billing the program for services provided to patients falsely presented as eligible to receive them. Troisi does not dispute the role that she played in the fraudulent scheme, which involved billing the government for $27.6 million in false claims, $19.9 million of which were paid. She appeals, arguing that there was insufficient evidence to prove beyond a reasonable doubt that she acted with the required culpable state of mind. We affirm her convictions.

I.

We summarize the basic contours of the healthcare fraud scheme and proceedings below, reserving a fuller exposition of the relevant facts for our analysis of the particular issues presented by this appeal. See United States v. López-Díaz, 794 F.3d 106, 109 (1st Cir. 2015) (citing United States v. Flores-Rivera, 787 F.3d 1, 9 (1st Cir. 2015)), cert. denied, 136 S. Ct. 1229 (2016).

On September 18, 2013, Troisi and co-defendant Michael Galatis[1] were indicted by a grand jury in the District of

---

[1] We have affirmed Galatis's conviction in United States v. Galatis, No. 15-1322, ___ F.3d ___ (1st Cir. Feb. 24, 2017).

Massachusetts on one count of conspiracy to commit healthcare fraud, see 18 U.S.C. § 1349, and eleven counts of substantive healthcare fraud,[2] see id. § 1347. Galatis was also separately charged with seven counts of money laundering. See id. § 1957. The indictment alleged that Galatis, the owner of At Home VNA ("AHVNA"), a home health-services agency, and Troisi, AHVNA's Director of Clinical Services since January 2010, had used AHVNA as a vehicle for defrauding Medicare by providing Medicare-reimbursable in-home nursing services to ineligible patients and then billing Medicare for those services based on falsified documents.

Medicare determines whether a beneficiary qualifies for coverage of home health services -- and, in turn, whether and to what extent to reimburse the beneficiary's healthcare provider for the cost of such services -- based primarily on information contained in two forms submitted by the healthcare provider. The first form, called the OASIS Form, documents the healthcare provider's assessment of the beneficiary's medical condition and needs. In filling out this form, a healthcare provider must, inter alia, rate on a numerical scale the beneficiary's ability to

---

[2] One of the substantive fraud counts was ultimately dismissed as to both defendants upon the government's motion because the Medicare beneficiary associated with the conduct underlying that charge was unable to testify at trial.

perform certain activities -- such as eating, dressing, and bathing -- without assistance.  The second form, called the Form 485 Home Health Certification and Plan of Care ("Form 485"), requires a physician to certify that (1) the beneficiary is confined to the home ("homebound"), (2) the beneficiary is in need of skilled services, (3) such "services will be or were furnished while the [beneficiary is or] was under the care of a physician," and (4) a "plan for furnishing the services has been established and will be or was periodically reviewed by a physician."  42 C.F.R. § 424.22.  Additionally, for services started after April 1, 2011, a physician must certify that a "face-to-face" encounter between the beneficiary and a physician, related to the beneficiary's need for the services, occurred no more than 90 days prior to or 30 days after the start of the services.[3]  Id.

The prosecution charged that the AHVNA scheme proceeded as follows.  AHVNA aggressively recruited Medicare-insured individuals for in-home nursing services, for which they could not legally receive Medicare coverage, either because they were not homebound or because they were not in need of such services.  Troisi instructed AHVNA's nurses to fill out those patients' OASIS

---

[3]     During the time period relevant here, each Form 485 "covered 60 days of services and could be renewed indefinitely upon recertification of the patient's continued need for such services."

- 4 -

Forms to represent, inaccurately, that the patients were incapable of caring for themselves. Troisi then personally prepared a Form 485 for each patient, populating it with whatever false information was required to obtain Medicare coverage for in-home nursing services. And AHVNA's Medical Director, Dr. Spencer Wilking, signed the forms without reviewing their contents or even, in many cases, meeting with the patients.[4]

AHVNA nurses made home visits to patients, but most of those visits did not actually involve the nurses providing skilled services. Yet at Troisi's direction, the nurses falsified their notes to indicate that they had provided such services. Using fraudulent records, AHVNA billed Medicare for tens of millions of dollars' worth of skilled nursing services, which had not been provided or had been provided unnecessarily, between 2006 and 2012, inclusive.

Only the portion of the scheme beginning on January 1, 2010 -- when Troisi became AHVNA's Clinical Director -- is relevant to this appeal. The government's theory was that Galatis agreed to promote Troisi from part-time employee to Clinical Director at that time because she could -- and did -- take the scheme "to another level." Accordingly, she had a direct stake in the fraud

_____

[4] Dr. Wilking pled guilty to one count of healthcare fraud for his role in the scheme and served as a witness for the government at trial.

even though she did not personally receive the reimbursement checks from Medicare.

Troisi and Galatis proceeded jointly to a jury trial on October 27, 2014.[5]  The district court declared a mistrial as to Troisi on November 30, 2014, after she became too ill to proceed. Troisi waived her right to a jury on retrial.  A bench trial before the same district judge who had presided over the earlier trial started on July 28, 2015.

The parties stipulated that "transcripts of the testimony of 27 government witnesses who testified at the earlier, joint trial, along with the exhibits admitted during the joint trial," would be admissible evidence at Troisi's bench trial.[6]  The government supplemented this evidence with live testimony from four additional witnesses.  In total, the government introduced 217 documentary exhibits, including the transcripts.  Its witnesses included patients linked to the substantive fraud counts, nurses who had provided care to those patients, most of those patients' primary care providers, and Dr. Wilking.

---

[5]    On December 3, 2014, the jury convicted Galatis of all of the charges against him, and he was ultimately sentenced to 92 months of imprisonment, to be followed by three years of supervised release, and ordered to pay $7,000,000 in restitution and a $50,000 fine.

[6]    This evidence had been received before the court ordered a mistrial and thus had been subject to cross-examination by Troisi.

At the conclusion of the government's case, Troisi moved for a judgment of acquittal, which was denied. In her defense, Troisi called no witnesses and introduced five exhibits. The thrust of her defense was that the government had not proved that she possessed the requisite mens rea to commit the relevant crimes.

On August 5, 2015, the day after the trial ended, the district court delivered its verdict from the bench, finding Troisi guilty on all of the conspiracy and fraud counts. The court concluded that Troisi had participated in a "sophisticated scheme among the senior managers [of AHVNA] . . . to provide inaccurate information" to the government so as to secure payments, "which the [g]overnment was not obligated to make."[7] While "[h]er knowing and willful participation in this scheme with the intent to defraud [was] largely demonstrated circumstantially," the court found sufficient evidence that Troisi had "manipulat[ed]. . . the staff and . . . the paperwork" with the purpose of "extracting monies that [AHVNA was] not entitled to . . . through fraud, that is, [the] misrepresentation of material facts." The court sentenced

---

[7] The court noted that the AHVNA scheme was "somewhat unusual" because in most Medicare-fraud schemes, "no services are actually provided." The court correctly held, however, that the "services apparently provided" by AHVNA "simply were not services that the United States [was] supposed to pay for, and the parties to the fraud understood that." See, e.g., United States v. Vega, 813 F.3d 386, 398-99 (1st Cir. 2016) (describing a Medicare-fraud scheme that involved seeking reimbursement for services provided to ineligible beneficiaries).

Troisi to 36 months of imprisonment to be followed by three years of supervised release.  This appeal followed.

## II.

"In assessing a challenge to the sufficiency of the evidence, we 'examine the evidence, together with all inferences that may be reasonably drawn from it, in the light most favorable to the'" verdict.  López-Díaz, 794 F.3d at 111 (quoting United States v. Andújar, 49 F.3d 16, 20 (1st Cir. 1995)).  Where the factfinder drew "inferences from circumstantial evidence," we will not "second-guess[] [its] ensuing conclusions as long as (1) the inferences derive support from a plausible rendition of the record, and (2) the conclusions flow rationally from those inferences." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995). Ultimately, we ask "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. O'Donnell, 840 F.3d 15, 18 (1st Cir. 2016) (quoting United States v. Grace, 367 F.3d 29, 33 (1st Cir. 2004)).

A defendant violates 18 U.S.C. § 1347 if she "knowingly and willfully execute[s] a scheme [intended] to defraud a government health-care program," United States v. Iwuala, 789 F.3d 1, 12 (1st Cir. 2015), cert. denied, 136 S. Ct. 913 (2016), and she violates 18 U.S.C. § 1349 if she engages in a conspiracy to execute such a scheme, id. at 9.  "[T]he government may carry its

- 8 -

burden of proof [as to both offenses] wholly through circumstantial evidence." Id. at 11.

Troisi does not dispute that officials at AHVNA successfully executed a conspiratorial scheme intended to defraud Medicare. Nor does she dispute that she took actions that directly and crucially furthered that scheme. She attacks her convictions solely on the ground that the government allegedly failed to present sufficient evidence that she took those actions with the required culpable state of mind.[8] Cf. id. at 9.

We disagree. Troisi's culpable state of mind can be readily gleaned from "several strands of circumstantial evidence" presented at trial. Vega, 813 F.3d at 398.

First, Troisi cannot claim that she was ignorant. She was deeply familiar with the regulatory scheme that she helped contravene. She knew what was permitted and what was not. Compare López-Díaz, 794 F.3d at 112 (finding no evidence in the record to

---

[8] The parties do not dispute the applicable mens rea requirement. Troisi's brief frames that requirement as comprising two distinct elements: the defendant must have acted "willfully with knowledge that her conduct was unlawful" and with the "specific intent to defraud." Our case law recognizes that "willfulness" is normally understood to encompass "specific intent," and both terms require a finding that the defendant acted with a purpose to disobey or disregard the law, rather than by ignorance, accident, or mistake. See, e.g., United States v. LaPlante, 714 F.3d 641, 644 (1st Cir. 2013); United States v. Allen, 670 F.3d 12, 17 (1st Cir. 2012); United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009); United States v. Lizardo, 445 F.3d 73, 86 (1st Cir. 2006); see also Bryan v. United States, 524 U.S. 184, 191–92 (1998).

support claim that a defendant dentist knew about the "different" physician billing code system), with United States v. Singh, 390 F.3d 168, 187-89 (2d Cir. 2004) (allowing inference of fraudulent intent based on a defendant doctor's possession of the applicable billing code guidebook and his instructions to nurses as to how to fill out the forms). Troisi demonstrated her familiarity with the relevant regulations in multiple conversations in 2010 and 2011 with Martha Fisk of Holyoke Health Center, who called AHVNA to express concern about the fact that all of the orders prescribing home health services to Holyoke patients had been signed by Dr. Wilking, who had not seen the patients, rather than by the patients' primary care physicians. More than that, the conversations showed Troisi defending the questionable practices. Troisi insisted that AHVNA's paperwork was fine because the new "face-to-face" requirement in 42 C.F.R. § 424.22 had not yet taken effect. In addition, on her resume, Troisi professed her "[e]xpertise" in "PPS," the process by which medical providers submit payment requests to Medicare based on patients' OASIS Forms.

Troisi also exercised total control over AHVNA's preparation of the documentation required for Medicare reimbursement -- the aspect of the scheme that directly contravened the regulations she knew so well. See Vega, 813 F.3d at 398-99 (finding the defendant's "large degree of control over [her company's] operations" evidence that she knew the claims the

- 10 -

company was submitting to Medicare were fraudulent); United States v. Willett, 751 F.3d 335, 340 (5th Cir. 2014) (finding the defendant's "proximity to" and prominent role in "fraudulent activities" evidence of a culpable state of mind). As AHVNA's Clinical Director, Troisi was in charge of "developing [and] implementing . . . the day-to-day functions of clinical services, in accordance with current rules, regulations, and guidelines that govern Home Health Agencies." In fact, she oversaw AHVNA's team of nurses, who were hired fresh out of nursing school with no experience in home health services or Medicare regulations. Those inexperienced nurses were tasked with filling out patients' OASIS Forms, which Troisi reviewed and edited at weekly meetings along with the notes reflecting the services that the nurses had provided. Troisi also personally filled out the Form 485s before giving them to Dr. Wilking so that he could sign them. All of this documentation contained misrepresentations material to Medicare's payment decisions.

Further, in exercising her control over the documentation process, Troisi instructed the nurses to put in particular information regardless of whether it was true or not. She insisted that the nurses filling out OASIS Forms never assign a score of "zero" to a patient's ability to perform any activity (as such a score would indicate full independence); never state that a patient had not been home at the time of a scheduled visit

- 11 -

(as doing so would indicate that the patient was not homebound); and never check a box indicating that a patient had been "alert and oriented." When nurses protested that a patient's condition warranted a zero and that they were "not . . . comfortable" assigning a different score, Troisi would force them to do so, even though Troisi had not evaluated the patient herself and had no basis for disagreement.

At oral argument, Troisi tried to put an innocent gloss on this behavior, explaining that she was just an "aggressive" boss and that her rules were aimed at ensuring that the nurses qualified patients for home health services she believed the patients needed. But Troisi's "insistence" on qualifying patients for Medicare-reimbursable services "creates a strong inference that she did not care" whether the services "served a legitimate medical purpose" and that she therefore "not only knew of the fraud, but actively played a role in directing it." Vega, 813 F.3d at 399.

Additionally, Troisi's purported management style does not account for the incriminating actions she took on her own. Troisi would often personally change the number that a nurse had entered on an OASIS Form, using the same color pen that the nurse had used so as to make the form appear unaltered. Troisi would even replace entire pages in OASIS Forms completed by nurses if the forms contained information suggesting that the patient was

not actually homebound or in need of skilled services.  She knew that the OASIS Forms did not accurately reflect the opinions of the medical professionals who had evaluated the patients, and she directly facilitated the fraud.  See United States v. Njoku, 737 F.3d 55, 63 (5th Cir. 2013) (finding the defendant's instructions to a nurse to represent patients as homebound on OASIS Forms, despite the nurse's "concern that some patients were not homebound," evidence of the defendant's culpable state of mind).

Finally, Troisi filled out patients' Form 485s based on the contents of those falsified OASIS Forms, knowing that Dr. Wilking would sign them without taking the time to read them -- let alone meet with and evaluate the patients.  See Vega, 813 F.3d at 399 (finding evidence of the defendant's knowing complicity in healthcare fraud where she "allowed" her company to seek Medicare reimbursement for services "prescribe[d] [by a doctor] for patients he did not see").  And she continued to recertify patients for further home health services even when their nurses had recommended that they be discharged, their primary care physicians had sent letters explaining that such services were not needed, and the patients themselves had tried to discontinue the visits.

This evidence was sufficient to permit a reasonable factfinder to conclude, beyond a reasonable doubt, that Troisi conspired to commit, and indeed committed, healthcare fraud.  See, e.g., United States v. Eghobor, 812 F.3d 352, 362 (5th Cir. 2015)

(finding sufficient evidence of a healthcare-fraud conspiracy where the defendant "admitted patients . . . by falsifying OASIS forms," "create[d] [Form 485s] prescribing [those patients] home health care," and had the forms signed by a doctor who had never treated those patients).  The circumstances underlying each of the substantive fraud counts "share[] . . . the [same] badges of fraud that characterize[] the overall scheme."  Iwuala, 789 F.3d at 12.  Ultimately, "the guilty verdict finds [sufficient] support" in this record.  O'Donnell, 840 F.3d at 18 (quoting United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006)).

                              III.

     The convictions are affirmed.