# United States Court of Appeals
## For the First Circuit

No. 15-1322

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL J. GALATIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Robert L. Sheketoff for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

February 24, 2017

**LYNCH**, **Circuit Judge**.  Michael Galatis was convicted by a jury of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; healthcare fraud, in violation of 18 U.S.C. § 1347; and money laundering, in violation of 18 U.S.C. § 1957. The fraudulent activity took place from about January 1, 2006 to about October 2, 2012 and it involved billing Medicare for $27.6 million in false claims, about $19.9 million of which the government paid out to Galatis' company, At Home VNA ("AHVNA").

Galatis appeals his convictions, arguing there was trial error. He particularly argues that the district court committed reversible error by (1) allowing Galatis' associate to testify that the associate had pled guilty to one count of healthcare fraud arising from the same scheme, without sua sponte giving a limiting instruction; (2) permitting certain lay and expert witness testimony, which Galatis characterizes as concerning the meaning of terms in the applicable Medicare regulations; and (3) denying Galatis' preferred jury instruction as to the meaning of a particular certification requirement in the relevant Medicare provisions.  We affirm the convictions.  There is no appeal from the sentence.

I.

Home health services are eligible for coverage under Medicare if the individual who is the beneficiary of the services is (1) "confined to the home" (the "homebound" requirement);

- 2 -

(2) "under the care of a physician who establishes the plan of care"; (3) in need of at least one of a number of enumerated "skilled services as certified by a physician"; (4) "under a plan of care" as specified under the relevant regulation; and (5) receiving services "furnished by, or under arrangements made by, a participating [home health agency]." 42 C.F.R. § 409.42. In order to prove a beneficiary's eligibility for Medicare payment for home health services, providers must submit two forms to the U.S. Department of Health and Human Services ("HHS"). The first is a checklist known as an OASIS Form, a "voluminous document" that "details the beneficiary's condition."

In the second document, a Form 485 Health Certification and Plan of Care ("Form 485"), a physician certifies under pain of "fine, imprisonment, or civil penalty under applicable Federal laws," that the beneficiary meets the requirements for Medicare coverage of home health services. For any care starting on or after April 1, 2011, the Form 485 also requires a physician to certify in a separate addendum that a "face-to-face patient encounter" has occurred. This requires that there be an in-person meeting between a physician or a qualified non-physician practitioner and the beneficiary, which must be "related to the primary reason" for the beneficiary's home health services.

Michael Galatis set up and owned MJG Management, a home health agency, which operated under the name At Home VNA. The

prosecution presented evidence from AHVNA nurses and AHVNA's Medical Director that AHVNA had recruited individual patients by sending nurses to host "wellness clinics" at assisted living centers and public housing facilities, where the nurses provided services like flu shots, and in doing so collected insurance information and "convinc[ed residents] to sign on with [AHVNA]." Nurses would also sometimes recruit patients door-to-door. AHVNA nurses testified that a patient's insurance coverage was the only criterion they used to determine whether that person was eligible to be signed up for AHVNA's services. Specifically, nurses were instructed to only sign up patients who were on Medicare.

These nurses also testified that Galatis and/or Janice Troisi, his former colleague and codefendant,[1] instructed the nurses to fill out OASIS Forms inaccurately, telling the nurses never to score a patient as a "zero" in the "activities of daily living" category (a zero signifying full independence and no need for home health services); never to check a box indicating that a patient was "alert and oriented times three" (signifying that the patient was extremely alert and not in need of home health

---

[1] Troisi fell ill during trial and the district court declared a mistrial as to her. She was later convicted after a bench trial and sentenced to 36 months in prison, three years of supervised release with special conditions, and a special assessment of $1,100. We decide her appeal in a companion case, United States v. Troisi, No. 16-1046, ___ F.3d ___ (1st Cir. Feb. 24, 2017), issued on the same date as this opinion.

services); and to write their nurses' notes using words that made the care provided appear like skilled nursing services, even when it was not, and words that emphasized the patients' need for care. The nurses testified that Galatis and/or Troisi would review the OASIS Forms and nurses' notes at regular meetings and would force nurses to "correct" materials that did not make a sufficiently persuasive case for the patients' eligibility and need for services. Further, Galatis and Troisi would demand that nurses continue visits to patients whom the nurses had recommended be discharged, or would reassign those patients to new nurses as patients in continuing need of AHVNA's services.

Dr. Spencer Wilking, AHVNA's Medical Director, was responsible for signing the Form 485s submitted to HHS. Dr. Wilking testified that in the first year after he joined AHVNA, around 2006, he conducted visits with patients before completing these forms. But beginning in 2007, as the business expanded, Dr. Wilking began signing the forms without conducting the necessary visits or any other review. By 2011, Dr. Wilking was signing approximately one hundred and fifty Form 485 certifications at each weekly AHVNA staff meeting.

Starting in 2007, Dr. Wilking was paid a monthly consulting fee -- initially $2,500 per month, and then $3,500 per month as AHVNA's patient population increased -- for his services to AHVNA. Dr. Wilking admitted that he knew he was engaging in

misconduct and said he expressed concern about this to Galatis "three or four times." Dr. Wilking "chose to ignore" his own concerns and continued to sign the Form 485 certifications "because [he] was being paid quite a lot of money to do so." He estimated he had certified and re-certified thousands of AHVNA patients between 2006 and 2012 (including the ten patients named in the indictment), none of whom he had in fact seen or could guarantee actually needed home health services. Before Galatis' trial, Dr. Wilking was separately indicted and pled guilty to one count of Medicare fraud arising from his conduct at AHVNA.

Galatis and Troisi were indicted in September 2013. Galatis was charged with conspiracy to commit healthcare fraud, see 18 U.S.C. § 1349, eleven counts of healthcare fraud, see id. § 1347, and seven counts of money laundering, see id. § 1957.[2] At the end of a sixteen-day trial, the jury convicted Galatis on all submitted counts. The district court sentenced him to 92 months in prison and three years of supervised release, and ordered him to pay a $50,000 fine and $7,000,000 in restitution. This appeal from his convictions followed.

## II.

Galatis does not dispute the sufficiency of the evidence supporting his convictions, but does make three claims that the

---

[2]    The court eventually dismissed Count 9, one of the fraud counts, on the government's motion.

district court committed reversible error at trial. He argues that the district court should have given sua sponte a limiting instruction as to Dr. Wilking's testimony regarding Dr. Wilking's guilty plea. He argues that the court wrongly permitted testimony interpreting the legal meaning of the applicable Medicare regulations. And he argues that the district court erroneously rejected his preferred jury charge regarding the face-to-face encounter regulation. None of these claims succeeds. We address each in turn.

A. Admission of Evidence of Dr. Wilking's Guilty Plea

Galatis argues that the district court erred by not giving a limiting instruction after admitting evidence of Dr. Wilking's guilty plea and that this purported error and questions from the government permitted the jury impermissibly to use Dr. Wilking's plea as substantive evidence of Galatis' guilt. Galatis never requested that the district court give an instruction limiting the use of Dr. Wilking's guilty plea. Accordingly, his claim is reviewable for at most plain error. See United States v. Rodriguez, 759 F.3d 113, 121 (1st Cir. 2014). Galatis must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v.

Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Galatis cannot meet this standard.

During his testimony, Dr. Wilking was asked by the prosecutor, "Did anything happen to you as a result of your involvement with At Home VNA?" After the district court overruled an objection from defense counsel, Dr. Wilking answered that he had "pleaded guilty to a count of Medicare fraud," and, in response to further questioning, said that he had entered into a plea agreement. The prosecution moved to admit a copy of Dr. Wilking's plea agreement into evidence. The district court initially stated that it would not admit a copy of the plea agreement itself, but after defense counsel affirmatively stated that he had "no objection" to the document's admission, the court allowed the plea agreement into evidence.

Dr. Wilking further testified that, pursuant to the plea agreement, he had "agreed to tell the truth" in the hope of a reduced sentence and that, if he did not testify truthfully, he would "lose [the benefit of] the agreement and [] m[ight] be subject to a charge of perjury." He then testified, in response to the prosecutor's question, "Can you describe in your own words what it is that you did that resulted in your guilty plea?", about his role in the Medicare-fraud scheme at AHVNA.

Then, when asked by the prosecutor about who else was involved in the fraud, Dr. Wilking stated that Galatis and Troisi

had participated in the fraud and that Galatis "was the director . . . and the planner and the executor of the fraud."  Defense counsel objected to this answer, citing a lack of foundation, and the court overruled the objection, stating "[i]t c[ould] be developed in testimony . . . and then on cross-examination." Defense counsel cross-examined Dr. Wilking about his plea agreement and asked him whether he was testifying because of the benefit he would receive from the government for cooperation.

The prosecutor argued in closing that "Dr. Wilking[] pleaded guilty to health care fraud.  He's taken responsibility for his part in this fraud scheme," and emphasized that while Dr. Wilking had entered a plea agreement, that agreement was contingent on truthful testimony.  The prosecutor also argued:

> And Dr. Wilking testified, Yeah, I committed a fraud, but he told you that he didn't do it alone.  He told you that Mike Galatis ran the show, that Janice Troisi pushed the nurses to enroll those patients, and [that] he was the one who signed those forms.  Every one of them did their part, a three-legged stool.

Defense counsel, referencing the plea agreement, argued in closing that Dr. Wilking had testified against Galatis out of self-interest and characterized Dr. Wilking as the "rotten apple" of AHVNA.  The defense did not ask for instructions limiting the use of Dr. Wilking's plea.

At oral argument on appeal, defense counsel maintained that our opinions in United States v. Dworken, 855 F.2d 12 (1st

- 9 -

Cir. 1988), and United States v. Foley, 783 F.3d 7 (1st Cir. 2015), create a per se rule obliging the district court to give a limiting instruction when a co-conspirator's guilty plea is admitted into evidence. The limiting instruction would have advised the jury not to use Dr. Wilking's plea as evidence of Galatis' guilt.

The cases do not support Galatis' proposition. Dworken involved an improper closing argument, which we reviewed for harmless error. 855 F.2d at 29–32. We did not consider whether limiting instructions, which were in fact given in that case, must be given sua sponte. Id. In Foley, we found that the district court had not abused its discretion by admitting, accompanied by a limiting instruction, testimony from an associate of the defendant regarding that associate's guilty plea. 783 F.3d at 17–18. Again, the case said nothing about requiring a district court sua sponte to provide a limiting instruction. The absence of a limiting instruction here, then, was not error.

In any event, Galatis cannot demonstrate that the absence of a limiting instruction "affected [his] substantial rights" and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." See Duarte, 246 F.3d at 60. Galatis does not show that the government in fact used Dr. Wilking's guilty plea as substantive evidence of Galatis' guilt. The two moments in the trial to which Galatis points do not bear out his claim. The first is when Dr. Wilking testified about

- 10 -

Galatis and Troisi's involvement in the scheme. This was proper testimony by one participant in the fraud about other participants. The second was when the prosecutor referenced Dr. Wilking's guilty plea during closing arguments and said "[h]e's taken responsibility for his part in this scheme." This was an entirely proper use of Dr. Wilking's admission of guilt to strengthen Dr. Wilking's credibility and to blunt uses of the guilty plea by the defense to attack his credibility. See United States v. Torres-Colón, 790 F.3d 26, 30 (1st Cir.), cert. denied, 136 S. Ct. 185 (2015).

Galatis has not demonstrated that the lack of a limiting instruction made any difference to the outcome of the trial. The government presented overwhelming evidence against him. This evidence included testimony from AHVNA patients, AHVNA nurses, and primary care providers that showed that AHVNA plainly had not met the requirements for home health services under Medicare and that Galatis and Troisi had falsified the necessary forms to make it appear as if the patients were eligible. The jury reviewed OASIS Forms and Form 485s, submitted by AHVNA to HHS, that made assertions flatly contradicted by the testimony of AHVNA patients, their nurses, and their primary care providers. Dr. Wilking testified that he had routinely certified at the weekly staff meetings that patients were eligible under Medicare, even though he had not actually met with or examined the patients, and that

Galatis had known this.  The lack of a limiting instruction as to Dr. Wilking's guilty plea did not affect the jury's verdict.  See Torres-Colón, 790 F.3d at 31-32 (finding no plain error when there was "overwhelming evidence" to convict defendant).

B. Admission of Witness Testimony about Medicare Regulations and Jury Charge

We put this next set of challenges in context. Generally, it is up to the judge to instruct the jury on the meaning of the law, including law set forth in statutes and regulations.  See United States v. Prigmore, 243 F.3d 1, 17-18 & n.2 (1st Cir. 2001); Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997).  The trial court did so here in the final instructions and limited the witness testimony.  Galatis claims the judge got it wrong.  We will return to that topic after addressing claims that the trial judge erred by allowing others, in testimony, to address the law, which we review for abuse of discretion, see United States v. Weekes, 611 F.3d 68, 70 (1st Cir. 2010).

1. Lay Witnesses

The judge allowed lay witnesses -- an AHNVA patient, two primary care providers, and three AHVNA nurses -- to testify as to their understandings of certain Medicare terms such as "skilled nursing services" and "homebound" in describing what they had done

and why.[3]  The defense objected at trial, but the testimony was perfectly permissible "lay experiential expertise . . . 'founded on personal knowledge and susceptible to cross-examination,'" United States v. Vega, 813 F.3d 386, 394 (1st Cir. 2016) (quoting United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005)), which is admissible under Federal Rule of Evidence 701[4] as "the product of reasoning processes familiar to the average person in everyday life," Vega, 813 F.3d at 394 (quoting United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005)).

The challenged lay testimony helped the jury to understand what AHVNA patients, nurses, and primary care providers had observed and what they had been told to do.  It also was relevant to refute Galatis' articulated defense at trial that he was trying, in good faith, to comply with the regulations.  The testimony never purported to tell the jury what the law meant. See id. at 395 (distinguishing permissible lay witness testimony

---

[3]    For example, Nurse Julissa Batres-Barahona was asked by the prosecutor, "And roughly how many of your patients do you think needed skilled nursing services?", to which she responded, "I don't think any of them did."  Nurse Lety Rodasologaistoa was asked, "The patients you were seeing, were those patients homebound?", to which she responded, "By what I know now, they weren't."

[4]    Rule 701 permits lay opinion testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [which governs expert testimony]."  Fed. R. Evid. 701.

from improper lay witness testimony in which witnesses "lend[ed] the jury their knowledge of Medicare law to provide definitive commentary on the matter"). And during the testimony of one of the AHVNA nurses, the district court, in overruling defense counsel's objection, explained to the jury that although the AHVNA nurses' testimony illustrated their perception of the patients' qualifications under the regulations, the legal significance of the regulations would be explained by the court. There was no abuse of discretion in allowing the testimony.

2. Expert Witness

Galatis also objected to the testimony of an expert witness, Stephanie Fox, a Medicare-fraud investigator. He focuses his attack on three passages in Fox's testimony: her assertion that a physician signing a "plan of care" would normally have an "intimate relationship with th[e] beneficiary"; her explanation of what constitutes "skilled nursing services"; and her discussion of the relationship between and hierarchy among the federal Social Security Act, the Medicare regulations in the Code of Federal Regulations, and the Medicare Policy Manual.

Fox's testimony was admissible under Federal Rule of Evidence 702.[5] The district court made clear during a pretrial

_____

[5] Rule 702 specifies that a witness may testify as an expert if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

- 14 -

ruling that Fox could "introduce to the jury the regulatory regime that is out there," but that she could not "opine about [the relevant] provisions" or "be someone who comes in and says when people do this [then it] is fraud."  Fox never transgressed these proper limitations on her testimony.

Fox never purported to offer an interpretive gloss on the legal meaning of the regulations.  Her explanation of "skilled nursing services" hewed closely to the letter of the regulations themselves.  Her testimony about the relationship between physicians and patients -- and about the hierarchy among the statute, regulations, and policy manual -- was based on her professional experience as a Medicare investigator, not on legal expertise.  She never applied the regulations to the facts of the case or suggested that any actions by AHVNA had violated the law.  Her testimony aided the jury in understanding the regulatory framework without displacing the district court's role in instructing the jury as to that framework's legal significance.

C. Jury Charge

Since we have rejected Galatis' attacks on the admission of lay and expert testimony, we leap over the claims that the district court somehow compounded any such error in the jury

based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

- 15 -

instructions and get to the heart of the matter.  We also reject the argument, as contradicted by the record, that the jury was not told the witness testimony was not the law.

An important theory of the defense was that Galatis had made a good-faith, though unsuccessful, attempt at compliance with the Medicare provisions.  Specifically, the defense argued in its closing statement that Galatis had attempted to satisfy the face-to-face encounter requirement by sending "letters to other physicians [who] might have seen the patient."[6]  Galatis now challenges the district court's refusal to give his preferred instruction on the face-to-face encounter requirement.  He cites the principle that defendants are "entitled to have their intent assessed in the light of the interpretation of the [relevant law] that is most congenial to their case theory and yet also objectively reasonable."  Prigmore, 243 F.3d at 17.  Galatis argues that the instruction the district court chose to give violated this principle by undermining his theory that he had not intended to violate the regulation.  Not so.  As the district court properly

---

[6]    Defense counsel did assert during opening statements that the face-to-face encounter regulation "called for that visit to be conducted and [stated that it] can be conducted by the nurses and other practitioners who are the eyes and ears of the physician."  But Galatis does not assert in his appellate brief that his good-faith compliance theory relied on this aspect of the regulations, nor does he suggest on appeal that he presented any evidence that he attempted to comply with the regulations by having qualified non-physicians perform face-to-face encounters.

ruled, because Galatis presented no evidence to support this theory, there was no error in the refusal to give his instruction.

During the charge conference, defense counsel asked that the court, when instructing the jury on the "face-to-face encounter" requirements of the relevant regulations, include all the types of personnel qualified to perform face-to-face encounters, including qualified non-physician personnel.  See 42 C.F.R § 424.22(a)(1)(v)(A)(1)-(5).  The court refused, stating that there was no evidence that any qualified non-physicians had performed face-to-face encounters, and it rejected defense counsel's suggestion that some AHVNA nurses could be qualified. The next day, before the jury charge, defense counsel again requested that the district court list all personnel qualified to make a face-to-face encounter.  The district court again refused and stated that it would not "charg[e] the jury about things that [we]ren't relevant to the case."

In its charge, the court directed the jury to the Medicare Policy Manual, which was in evidence, and noted that the Manual "outlines in chapter and verse the various elements of what you have to do to get entitlement to [] Medicare benefits."  The court then gave a "short form" explanation of these requirements, which included the following:

> In addition, after April 1, 2011, the establishment of a plan of care, as relevant to the evidence developed in this case, must have been the result of a face-to-face

- 17 -

encounter related to the primary reason for the home health care services, between either the certifying physician or a physician who has cared for the patient in an acute or post-acute facility. The encounter must have occurred within 90 days prior to the start of care or within 30 days after the start of care. The encounter must be documented by the certifying physician in a distinct section of the Form 485 signed by the certifying physician.

Defense counsel then again objected to the omission of qualified non-physician personnel from the instruction on the face-to-face encounter requirement, and the district court again denied the objection.

We review de novo properly preserved claims of legal error based on the district court's refusal to give a requested instruction. United States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir.), cert. denied, 136 S. Ct. 559 (2015).[7] Challenges to refused requested instructions succeed where the requested instruction was "(1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) [related to] a sufficiently important point that the failure to give it seriously impaired the defendant's ability to present his or her defense." Prigmore, 243 F.3d at 17.

---

[7] The government argues that Galatis has forfeited or waived this claim because he argued to the district court that his preferred instruction was appropriate because AHVNA nurses were in fact qualified non-physicians under the requirement, not because he had made a good-faith effort at compliance by contacting other physicians. We need not decide this issue, because even if properly preserved, the argument fails.

Galatis cannot meet this standard. His good-faith theory rested on his claim that he had attempted to contact other physicians who might have seen AHVNA's patients. He presented no evidence that qualified non-physician personnel had performed face-to-face encounters or that he had had a factual basis to believe that to be the case. See United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir. 2002) (explaining that a defendant's right to a preferred instruction "extends only to those defenses for which there is sufficient evidentiary support"). There was no error in the district court's instruction.

## III.

We affirm Galatis' convictions.